1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10   DEANDRE DELONEY,

11            Petitioner,                No. 2:11-cv-2914-EFB P

12        vs.

13   TERRY GONZALEZ,                     ORDER AND
                                         FINDINGS AND RECOMMENDATIONS
14            Respondent.
     _____/

15

16        Petitioner is a state prisoner without counsel proceeding with an application for a writ of

17   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges a 2008 judgment of

18   conviction entered against him in the Sacramento County Superior Court on charges of assault

19   with a firearm and shooting at an occupied vehicle, with sentence enhancements for being armed

20   with and using a firearm and for committing the offenses for the benefit of a street gang.  He

21   seeks relief on the grounds that his conviction is supported by insufficient evidence, the

22   prosecutor committed misconduct during closing argument, and evidentiary rulings by the trial

23   court violated his right to due process.  Upon careful consideration of the record and the

24   applicable law, the undersigned recommends that petitioner's application for habeas corpus relief

25   be denied.

26   /////

1

I.      **Factual and Procedural Background**

In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following factual summary.

> A jury found defendant Jimmy Lee Jones guilty of assault with a firearm on Andrelia, a minor (Pen.Code, § 245, subd. (a)(2); count 1),[1] shooting at an occupied vehicle (§ 246; count 2), and unlawful possession of a firearm (§ 12021, subd. (c)(1); count 3.)[2]  The jury also found true allegations Jones personally used a firearm in the commission of count 1 (§ 12022.5, subd. (a)(1)); personally discharged a firearm and proximately caused great bodily injury to Andrelia in the commission of count 2 (§§ 12022.53, subd. (d), 12022.7); personally inflicted great bodily injury to Andrelia in the commission of counts 1 and 2 (§ 12022.7, subd. (a)); and committed counts 1 and 2 for the benefit of or in association with the Del Paso Heights Bloods (DPHB), a criminal street gang (§ 186.22, subds.(b)(1), (4)).
>
> The jury found defendant Deandre Deloney aided and abetted Jones in the commission of counts 1 and 2, and thus, was guilty of those offenses.  The jury also found true allegations Deloney (1) was a principal in the commission of count 1 and a principal was armed with a firearm (§ 12022, subd. (a)(1)); was a principal in the commission of count 2 and a principal personally discharged a firearm and proximately caused great bodily injury to Andrelia (§§ 12022.53, subds.(d), (e)(1), 12022.7); and committed counts 1 and 2 for the benefit of or in association with the DPHB (§ 186.22, subds.(b)(1), (4)).
>
> The trial court sentenced Jones to an aggregate term of 40 years to life in state prison, consisting of 15 years to life on count 2 (§§ 246, 186.22, subd. (b)(1), (4)(B)), plus an additional 25 years to life for personally discharging a firearm and proximately causing great bodily injury.  The court sentenced Jones to a concurrent[3] 20 years on count 1, consisting of three years for the underlying offense, plus a consecutive four years for personally using a

/////

---

[1]  Further unspecified references are to the Penal Code.

[2]  Defendants were tried jointly but with separate juries.

[3]  Where, as here, the trial court fails to specify whether a sentence on a subsequent count is to run concurrently or consecutively, the term runs concurrently. (§ 669.)

2

firearm, plus a consecutive three years for personally inflicting great bodily injury, plus a consecutive 10 years for the gang enhancement.[4]

The court sentenced Deloney to an aggregate term of 30 years to life, consisting of five years on count 2, plus a consecutive 25 years to life for being a principal in the commission of count 2 where a principal personally discharged a firearm and proximately caused great bodily injury. The court sentenced him to a concurrent nine years on count 1, consisting of three years for the underlying offense, plus one year for being a principal in the commission of count 1 where a principal was armed with a firearm, plus five years for the gang enhancement.[5]

Defendants appeal, contending (1) there is insufficient evidence to support the jury's findings that Jones did not act in self-defense in committing counts 1 and 2 and that Deloney aided and abetted in the commission of those offenses; (2) the court prejudicially misled the jury in responding to a question concerning "mutual combat" and abused its discretion in refusing Jones's request to reopen closing argument on that issue; (3) there is insufficient evidence to support the gang enhancements; (4) the court abused its discretion in admitting evidence concerning gangs and gang affiliations; (5) the court erred in admitting evidence that an unidentified witness stated defendants shot Andrelia; (6) the court erred in excluding evidence that others claimed responsibility for shooting Andrelia; (7) their convictions were obtained through the knowing use of false testimony in violation of *Napue v. Illinois* (1959) 360 U.S. 264 [3 L.Ed.2d 1217] (*Napue*); (8) the prosecutor committed misconduct during closing arguments; and (9) their sentences on count 1 must be stayed pursuant to section 654, and the abstracts of judgment must be corrected to accurately reflect their sentences.

We shall conclude the trial court abused its discretion in admitting evidence that an unidentified witness stated defendants shot Andrelia, but find that the error was harmless with the exception of the jury's finding that Jones personally inflicted great bodily injury to Andrelia.  We shall reverse that finding and strike the three-year enhancement for personally inflicting great bodily injury appended to Jones's sentence on count 1.  We shall further conclude that defendants' sentences on count 1 must be stayed pursuant to section 654.  We shall affirm the judgments in all other respects. Finally, we shall direct the trial court to amend the abstracts of

---

[4]  The trial court stayed Jones's sentence on count 3 and the remaining enhancements pursuant to section 654.

[5]  The trial court stayed Deloney's sentence on the gang enhancement on count 2 pursuant to section 654.

judgment to reflect those modifications, as well as the following: defendants' liability for victim restitution is joint and several.

**FACTUAL AND PROCEDURAL BACKGROUND**

On February 17, 2007, 15–year–old Andrelia and her friends Raukiya and Keeburee went to the home of Keeburee's boyfriend "Baby J" to smoke marijuana. Baby J lived in an area of Del Paso Heights known as "the Flats." While they were there, Keeburee got upset and left. The others followed her down the street and around the corner near Deloney's house. As they walked past Deloney's house, Keeburee called Baby J a "bitch." Defendants, O'Neil Deloney,[6] and two other men were in Deloney's front yard and told Baby J he should slap Keeburee. Baby J responded that he was going to get his sister to fight Keeburee. Keeburee began yelling at the men, and they told her, "Bitch, you ain't nobody, nobody special."

Keeburee telephoned her brother Anthony Ivy and announced that her brothers were coming over. Deloney said he was going to call some girls, and Keeburee, Andrelia, and Raukiya went to Raukiya's house to wait for Keeburee's brothers and to prepare to fight the girls Deloney said he would call.

A short time later, Keeburee's brothers – Anthony, Muhammad, and Malcolm Ivy[7] – arrived, along with Muhammad's "baby mama" Latoya Taylor, Rayshawn Smith, and an unidentified man and woman. Everyone except Raukiya drove to Deloney's house in two cars. Raukiya arrived later. Raukiya's little brother Famous, who was 14–years–old at the time, overheard Keeburee talking about fighting some girls and rode his bike to a corner near Deloney's house to watch.

When the two cars pulled up near Deloney's house, everyone but the unidentified man got out. Keeburee picked up a golf club and used it to knock on the door to Deloney's house. An elderly woman answered, and Keeburee demanded to speak to Deloney. Deloney and O'Neil appeared in the driveway, and everyone began yelling. Muhammad challenged O'Neil to a fight, and Deloney said he would get someone to fight Keeburee. Anthony then stepped in and told O'Neil, "I'm "fittin' to beat your ass." Anthony and O'Neil squared off and engaged in a fist fight. Anthony quickly overpowered O'Neil. While Anthony had O'Neil on the ground, Anthony said, "Nigga, this is Oak Park. This is Zilla." "Zilla" is a street gang from Oak Park that has "clicked" up with

---

[6] To avoid confusion, we refer to O'Neil Deloney by his first name.

[7] To avoid confusion, we shall refer to Anthony, Muhammad, and Malcolm Ivy by their first names.

4

the Oak Park Bloods, meaning the two gangs "work together" and have "become almost the same gang."  Anthony told O'Neil to say that "Zilla whipped [his] ass" and that Keeburee was "the best." O'Neil said Keeburee was the best but refused to say anything about Oak Park or Zilla.  After he was through with O'Neil, Anthony began calling out his gang, yelling, "[T]his is Oak Park. This is Zilla. Whoop de whoop.  Fuck the Flats . . . .  All y'all can get it."  Jones responded, "Nah, nigga.  Fuck Oak Park.  This is the Flats."  Malcolm then got in Jones's face and said, "This is Oak Park."  Jones responded, "I don't give a fuck.  You feel me?  It's still the Flats.  You feel me, nigga.  You feel me?"  Malcolm said, "Nigga, I'll beat all y'all asses...."

At that point, Andrelia and Raukiya began walking toward Raukiya's house, while Keeburee and the rest of the Oak Park group began walking toward the two cars.  As Smith walked toward the cars, he lifted his shirt to reveal a gun in his waistband or pocket and said, "All y'all some bitches, whoop de whoop.  All y'all can get it.  I'll kill all y'all niggas, whoop de whoop.  Don't none y'all niggas want it, woo woo."[8]  Meanwhile, the members of the Oak Park group, except Keeburee and Smith, got into the two cars.

By that time, five or six members of defendants' "crew" were walking up the street and began arguing with Smith and Keeburee. As members of the crew arrived on the scene, Deloney went inside. When he returned, he had a gun and handed it to Jones. Jones then walked into the middle of the street and announced, "You think you're the only one with blaps things."[9]  "Blaps" is a slang term used by Bloods to refer to guns.  At that point, Andrelia and Raukiya ducked behind a truck.  Andrelia could still see Jones and Smith.  Smith walked backwards toward one of the cars with his gun pointed straight out, while Jones stood in the middle of the street holding his gun at a 45 degree angle.

Several shots were fired.  Neither Andrelia nor Famous knew who fired the first shot; however, Andrelia testified that the first shot was fired "before I even seen [Jones] lift his arm up."  Jones and Smith each fired at least one shot.  Famous saw Jones shoot his gun "towards . . . where the truck was, where [his] sister and [Andrelia] was . . . ."  Andrelia was struck in the side and left

---

[8]  Famous testified that Smith pulled the gun out of his pocket enough to reveal the handle.  When interviewed by police, Andrelia said Smith displayed the gun in his waistband. At trial, however, she testified that Smith pulled the gun out, waved it around, and pointed it at defendants.

[9]  At trial, Andrelia testified that Smith waved a gun in Jones's face when Jones walked into the middle of the street.  When interviewed by police following the incident, she did not say that he waved it around.  Famous testified that Smith did not wave the gun around.

paralyzed from the waist down.  Just before she blacked out, Andrelia saw Anthony hanging out of the window of one of the cars with a gun in his hand.  She did not know whether he fired the gun.

After the shooting, defendants got into a van and left, while members of the Oak Park group drove out of the neighborhood, leaving Raukiya and Andrelia.  Jones was wearing a red shirt at the time of the shooting.

Officer Robert Quinn, a detective in the gang suppression unit and the lead investigator in this case, testified as an expert in African American gangs, specifically the DPHB.  His specialty within the gang unit is African American gangs in north Sacramento, including the DPHB.  Over the years, he has had contact with members of the DPHB at least 100 times and is familiar with their territory, subsets, symbols, hand signs, tattoos, color, members, and crimes.  According to Quinn, the DPHB operate mainly in the Del Paso Heights neighborhood in north Sacramento.  The DPHB have numerous subsets, including Elm Street, the Dark Side, and the Flats.  The subsets operate in smaller geographic areas within Del Paso Heights.  While the DPHB's main rivals are "[a]ny and all Crip sets in Sacramento," they also feud with other Blood sets, including the Oak Park Bloods.  The primary activities of the DPHB street gang are murder, attempted murder, assault with a deadly weapon, narcotic sales, robbery, burglary, and auto theft. Quinn testified at trial regarding past felony convictions of members of the DPHB.

Gang members like to broadcast their gang affiliation to other gang members.  They do this through words, hand signs, tattoos, and wearing particular colors.  Bloods are associated with the color red. According to Quinn, "[i]n the gang culture, respect is almost more powerful than money. . . ."  Respect is obtained through fear, intimidation, and the commission of crimes.  In gang culture, you lose respect if you are "disrespected" and fail to respond.  If a gang member is challenged by a rival gang member and backs down, the gang member loses respect.  To retain the respect of other gang members, a gang member must respond to a challenge by meeting the challenge and then taking it to the "next level."  For example, "[w]hen another gang [member] . . . yells out in your turf and yells out their gang to you and you don't meet that, then your gang as a whole loses respect as well as you amongst that gang."  Likewise, "if that rival gang . . . come[s] into your territory, [and] starts showing off a weapon," "[y]ou would lose respect if you didn't at least meet it or take it to the next level."

Quinn opined that Deloney was an active member of the DPHB street gang at the time of the shooting based on his membership in the Flats, a subset of the DPHB; his six prior arrests for selling marijuana, a primary activity of the Flats and the DPHB; his

association with validated members of the DPHB; and his wearing of the color red.  Deloney was observed in the company of validated DPHB gang members before and after the shooting.  In March 2005, he was seen in the company of Ronny Jones, a validated member of the DPHB and the Flats.  In October 2006, he was seen in the company of Christopher Blundt, a validated member of the DPHB and the Flats.  When Deloney was arrested in this matter in March 2007, he was with Ronny Jones and was wearing a red sweatshirt.

Quinn also opined that Jones was an active member of the DPHB street gang at the time of the shooting based on his prior arrest for selling marijuana; his membership in the Flats; his association with validated members of the DPHB; and his wearing of the color red.  Like Deloney, Jones was seen in the company of validated members of the DPHB before and after the shooting.  In August and September 2006, he was seen in the company of Christopher Blundt, a validated member of the DPHB and the Flats.  In September 2006, he was seen in the company of Tony Armstrong and Ronny Jones, validated members of the DPHB and the Flats.  Moreover, at the time of the shooting and at the time of his arrest a month later, Jones was wearing a solid red t-shirt.  In addition, just before the shooting, he used the term "blap," a slang term used by Bloods to refer to a gun.

Finally, Quinn opined that the shooting was gang-related and committed in association with and for the benefit of the DPHB street gang.  In support of his opinion, Quinn cited defendants' membership in the Flats, which is "known as a Blood gang subset of the Del Paso Heights Bloods,"  Jones's statement, "Fuck Oak Park, this is the Flats," and Jones's wearing of the color red.

**The Defense**

Neither defendant testified at trial.  During closing arguments, neither defendant disputed that Deloney gave Jones a gun or that Jones fired it.  Rather, both argued that Jones acted in self-defense.  Deloney also argued that he handed Jones the gun to use to defend himself and Deloney and not to commit assaultive crimes.

ECF 12-1 at 2-13.

After the California Court of Appeal issued its decision on petitioner's direct appeal,

petitioner filed a petition for review in the California Supreme Court.  Resp't's Lodg. Doc. 14.

On February 16, 2011, that petition was summarily denied.  Resp't's Lodg. Doc. 16.

/////

/////

7

## II.       Standards for a Writ of Habeas Corpus

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or application of state law.  *See Wilson v. Corcoran*, 562 U.S.___, ___, 131 S. Ct. 13, 16 (2010); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Park v. California*, 202 F.3d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the state court decision.  *Stanley v. Cullen*, 633 F.3d 852, 859 (9th Cir. 2011) (*citing Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)).  Nonetheless, "circuit court precedent may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably."  *Stanley*, 633 F.3d at 859 (quoting *Maxwell v. Roe*, 606 F.3d 561, 567 (9th Cir. 2010)).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts.  *Price v. Vincent*, 538 U.S. 634, 640 (2003).  Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant

the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.[10] *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Williams*, 529 U.S. at 413; *Chia v. Cambra*, 360 F.3d 997, 1002 (9th Cir. 2004).  In this regard, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 412. *See also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007); *Lockyer*, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'").  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S.___,___,131 S. Ct. 770, 786 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*,131 S. Ct. at 786-87.

If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims. *Delgadillo v. Woodford*, 527 F.3d 919, 925 (9th Cir. 2008); *see also Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

---

[10]  Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding." *Stanley*, 633 F.3d at 859 (quoting *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004)).

The court looks to the last reasoned state court decision as the basis for the state court judgment. *Stanley*, 633 F.3d at 859; *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Richter*, 131 S. Ct. at 784-85. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." *Id.* at 785 (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)). Similarly, when a state court decision on a petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits. *Johnson v. Williams*, 133 S.Ct. 1088, 1091 (2013).

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). *Stanley*, 633 F.3d at 860; *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." *Himes*, 336 F.3d at 853. Where no reasoned decision is available, the habeas petitioner still has the burden of "showing there was no reasonable basis for the state court to deny relief." *Richter*, 131 S. Ct. at 784.

When it is clear, however, that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review the claim de novo. *Stanley*, 633 F.3d at 860; *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006); *Nulph v. Cook,* 333 F.3d 1052, 1056 (9th Cir. 2003).

## III. Petitioner's Claims

### A. Sufficiency of the Evidence

In his first ground for relief, petitioner claims that "the People failed to present evidence defendants did not act in self defense." ECF 1 at 5.  He presents four arguments in support of this claim:  (1) the prosecution failed to prove beyond a reasonable doubt that "one party or another shot first," (2) the jury was instructed on alternative theories of guilt, and "may have relied on a invalid one;" (3) the prosecutor presented "4 theorys [sic], none of which was valid;" and (4) the theories presented by the prosecutor were "factually invalid." *Id.*  On appeal in state court, petitioner argued that his convictions for assault with a firearm (Count 1) and shooting at an occupied vehicle (Count 2) should be reversed because they were "based on factually and legally inadequate theories of guilt."  Resp't's Lodg. Doc. 8 at 18.  Specifically, petitioner claimed that the four theories advanced by the prosecutor under which the jury could reject petitioner's claim of self defense and/or defense of others were all unsupported by the evidence and the law.  *Id.* at 18-29.

In his second ground for relief before this court, petitioner claims that his "convictions and gang findings are based on insufficient evidence."  ECF 1 at 7.  In support of this claim, he presents the following three arguments: (1) "the evidence of Jones (co-defendant) is insufficient;" (2) "the evidence of Deloney is insufficient;" and (3) "the evidence of actions for or by DPHB is insufficient."  *Id.*  On direct appeal, petitioner argued that his convictions on Counts 1 and 2, and the true finding on the gang enhancement should be reversed because there was insufficient evidence that Jones committed the crimes charged and, therefore, there was no crime for which petitioner could be vicariously liable.  Resp't's Lodg. Doc. 8 at 45-49.  Petitioner also argued that there was insufficient evidence he knowingly and intentionally aided the crimes Jones committed.  *Id.* at 49-52.  Finally, petitioner claimed that, "at the very least," the gang findings and enhancements should be reversed because there was insufficient evidence he acted "for or with" the DPHB gang.  *Id.* at 45, 52-54.

In the petition before this court, petitioner is essentially claiming that: (1) the evidence is insufficient to support the jury's apparent finding that Jones did not act in self-defense in committing assault with a firearm (Count 1) and shooting at an occupied vehicle (Count 2); (2) the evidence is insufficient to support the jury's finding that petitioner aided and abetted the crimes committed by Jones; and (3) the evidence is insufficient to support the jury's finding that petitioner and Jones committed the crimes alleged in Counts 1 and 2 for the benefit of or in association with a street gang.

### 1.    State Court Opinion

The California Court of Appeal rejected all of petitioner's challenges to the sufficiency of the evidence supporting his convictions and the gang enhancement allegation.  With regard to petitioner's claims that the evidence was insufficient to refute the defense theory that Jones acted in self-defense, or to support the jury's finding that petitioner aided and abetted the crimes committed by Jones, the court reasoned as follows:

> **Substantial Evidence Supports Defendants' Convictions On Counts 1 and 2**
>
> Defendants contend there is insufficient evidence to support their convictions for assault with a firearm (count 1) and shooting at an occupied vehicle (count 2).  More particularly, they claim there is insufficient evidence to support the jury's implicit finding that Jones did not act in lawful self-defense in committing those offenses.[11]  Alternatively, Deloney asserts there is insufficient evidence he aided and abetted Jones in committing the offenses.  Both claims lack merit.
>
> **A. Right to Self–Defense**
>
> The People had the burden of proving beyond a reasonable doubt that Jones did not act in lawful self-defense or defense of another. (*People v. Adrian* (1982) 135 Cal.App.3d 335, 340; *People v. Banks* (1976) 67 Cal.App.3d 379, 383–384.)  In attempting to satisfy that burden, the prosecutor argued: (1) Jones did not

---

[11]  Defendants argue both that there is insufficient evidence Jones did not act in self-defense and that the theories proffered by the prosecutor as to why Jones did not act in self-defense were factually inadequate.  Because these arguments are two sides of the same coin, we address them together.

actually or reasonably believe he was in imminent danger of being shot; (2) Jones provoked members of the Oak Park group with the intent of creating an excuse to use force; and (3) Jones and members of the Oak Park group were engaged in mutual combat. Defendants contend that none of those theories are supported by the evidence, and thus, "[t]he jury necessarily based its guilty verdicts on an invalid theory."[12]

In addressing whether there is sufficient evidence to support the prosecutor's theories, we view the entire record in the light most favorable to the judgments and presume in support of the judgments the existence of every fact that the jury reasonably could deduce from the evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053; *People v. Golde* (2008) 163 Cal.App.4th 101, 108.)

"For [an assault with a firearm or shooting at an occupied vehicle] to be in self-defense, the defendant must actually and reasonably believe in the need to defend." (*See People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.) The fear must be of imminent danger to life or great bodily injury. (*Ibid.*)

Viewed in the light most favorable to the judgment, the evidence showed that Deloney did not obtain and Jones did not display the gun until after members of the Oak Park group were walking toward their cars and members of defendants' crew had arrived on the scene. Moreover, Jones did not immediately start shooting once he obtained the gun. Rather, he walked into the street and toward the Oak Park group with the gun and announced, "You think you're the only one with blaps things." It was only after Jones displayed his gun and made that comment that Smith removed his gun from his waistband. Furthermore, when a gang member is challenged by a rival gang member, the challenged gang member must respond by meeting the challenge or taking it to the next level in order to retain the respect of other gang members. This is especially true where, as here, a rival gang comes into another gang's territory, yells out their gang, and shows off a weapon.

On this record, a juror reasonably could conclude that Jones did not actually believe he or Deloney was in imminent danger of being killed or suffering great bodily injury when he walked into the street with the gun; but rather, was responding to a challenge by a rival gang in an attempt to retain his respect. As discussed in

---

[12] Defendants also claim the prosecutor's asserted theory that any actual belief by defendants that they were in imminent danger was unreasonable was not only factually inadequate but legally inadequate. Because that claim is premised on comments made by the prosecutor during closing arguments, we shall treat it as one for prosecutorial misconduct. It is discussed in section VIII, *infra*.

part III, supra, there is substantial evidence defendants committed counts 1 and 2 for the benefit of or in association with the DPHB.

Defendants argue that even if the right to self-defense did not attach at that point, it most certainly did once defendants were being fired upon.  According to defendants, "It is inconceivable that Jones did not believe he was in grave peril while he stood in the street watching an adversary firing in his direction."

"'The right of self-defense is not available to a person who seeks a quarrel with the intent to create a real or apparent necessity of exercising self-defense.'"  (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1381, fn. 10.)  In other words, if Jones provoked members of the Oak Park group with the intent of creating an excuse to shoot, he had no right to self-defense.  As the People point out, "the evidence indicated that [defendants] made several statements and engaged in actions that the jury could reasonably have interpreted as 'provok[ing] a fight or quarrel with the intent to create an excuse to use force.'"  Significantly, the Oak Park group was in the process of leaving when Jones walked into the street, displayed a gun, and yelled, "You think you're the only one with blaps things?"  Smith, who had a gun in his waistband and was continuing to argue with Jones, was walking backward toward the cars.  Smith did not remove his gun until after Jones walked into the middle of the street, displayed his gun, and announced that Smith was not the only one with a gun.  On this record, a juror reasonably could conclude that Jones, by his actions, intended to provoke a gunfight.  Accordingly, sufficient evidence supports a finding that Jones did not have a right to self-defense even after Smith and other members of the Oak Park group began shooting.[13]

Given our conclusions, we need not consider whether sufficient evidence supports a finding that Jones and members of the Oak Park group were engaged in mutual combat or whether Jones reasonably believed he was in imminent danger of being shot.  Because the record does not disclose which theory the jury based its finding that Jones did not act in self-defense, we may affirm the judgment so long as there is at least one valid ground for the jury's finding.  (*See People v. Guiton* (1993) 4 Cal.4th 1116, 1129 ["If the inadequacy of proof is purely factual, of a kind the jury is fully equipped to detect, reversal is not required whenever a valid ground for the verdict remains, absent an affirmative indication in the record that the verdict actually did rest on the inadequate ground."].)  In other words, even assuming the mutual combat or

---

[13]  Because we conclude sufficient evidence supports a finding that Jones intentionally provoked the gunfight, we necessarily reject defendants' contention that the trial court erred in instructing the jury in the language of CALCRIM No. 3472 (Right to Self–Defense: May Not Be Contrived).

lack of reasonable belief theories were factually inadequate, so long as the record does not indicate the jury based its findings on either of these grounds, reversal is not required where a valid ground for the jury's finding remains.  Such is the case here.

### B. Aiding and Abetting

Should we conclude, as we have, that there is sufficient evidence to support the jury's finding that Jones did not act in lawful self-defense of himself or others, Deloney contends there is insufficient evidence he aided and abetted Jones in the commission of counts 1 and 2.  More particularly, he asserts there is insufficient evidence that, at the time he handed Jones the gun, he (1) "knew Jones intended to use the gun to commit assaultive crimes, not to defend himself or his friends from bodily injury"; and (2) "intended that Jones commit assaultive crimes and not defend himself and [Deloney]."  We are not persuaded.

"Under California law, a person who aids and abets the commission of a crime is a 'principal' in the crime, and thus shares the guilt of the actual perpetrator. (§ 31.)"  (*People v. Prettyman* (1996) 14 Cal.4th 248, 259.)  "[A]n aider and abettor is a person who, 'acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages, or instigates, the commission of the crime.'"  (*Ibid.*)

When viewed in the light most favorable to the judgment, the evidence shows Deloney aided and abetted Jones in the commission of counts 1 and 2.  Defendants were both members of the Flats, a subset of the DPHB.  Deloney retrieved the gun and gave it to Jones after members of a rival gang yelled out their gang and displayed a gun in defendants' territory, members of the Oak Park group were walking toward their cars, and members of defendants' "crew" arrived on the scene.  Under those circumstances, the jury reasonably could conclude that Deloney knew Jones intended to shoot at members of the Oak Park group in response to the group's insults and taunts and not to defend himself or Deloney, and that Deloney intended to and did assist Jones in doing so by handing him the gun.

ECF No. 12-1 at 13-19.

The California Court of Appeal also rejected petitioner's argument that the evidence was insufficient to support the gang enhancement allegation.  The court reasoned as follows:

/////

/////

**Sufficient Evidence Supports The Gang Enhancements**

Defendants next contend there is insufficient evidence to support the jury's findings that defendants committed counts 1 and 2 "for the benefit of or in association with" the DPHB, a criminal street gang.  (§ 186.22, subds.(b)(1) and (b)(4)).[14]  They observe that there is no evidence that anyone mentioned the DPHB during the dispute and argue that "the only evidence tending to support [the jury's] findings [i]s Detective Quinn's opinion that the Flats is a 'subset' of DPHB."  According to defendants, Quinn gave no basis for his opinion, and his opinion alone is insufficient to support a finding that they acted for the benefit of or in association with the DPHB.  Defendants are mistaken.

During the dispute, Jones repeatedly announced, "This is the Flats" in response to Anthony and Malcolm calling out their gang, Oak Park.  Contrary to defendants' assertion, Quinn did state a basis for his opinion that the Flats is a subset of DPHB.  He specified that his opinion was "based on [his] experience and [his] contacts with gang members and nongang members in the street . . . ."  He then explained that "the Flats are known as a Blood gang subset of the Del Paso Heights Bloods.  You ask people who are part of that and they'll tell you that.  People who are not a part of that [who] live in the neighborhood . . . explained to me that [the Flats is] a Blood gang, part of [the] DPH[B]."  He also noted that graffiti found in the Flats "lets people know that this is DPH[B] and a Blood territory, and then you see Flats on the street."

*People v. Williams* (2008) 167 Cal.App.4th 983, relied on by defendants, is readily distinguishable.  In that case, the court addressed "the relationship that must exist before a smaller group can be considered part of a larger group for purposes of determining whether the smaller group constitutes a criminal street gang."  (*Id.* at p. 985.)  There, the defendant was convicted of murder and active participation in a criminal street gang.  (*Ibid.*)  On appeal, he challenged the sufficiency of the evidence to support the jury's finding on the gang activity special circumstance and the active participation charge.  (*Id.* at p. 986.)  As an initial matter, he argued that the group relevant to the court's determination was the Small Town Peckerwoods and not other groups calling themselves Peckerwoods or some overall Peckerwood gang.  (*Id.* at p. 987.)  He asserted that "there was no evidence he was an active participant in any group other than the Small Town Peckerwoods, and there was insufficient evidence of a connection between

---

[14]  Subdivisions (b)(1) and (b)(4) of section 186.22 provide for sentence enhancements for persons convicted of felonies that are "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ."  The length of the enhancement depends upon the felony.  (§ 186.22, subds.(b)(1), (4).)

members of the Small Town Peckerwoods and anyone else."
(*Ibid.*, fn.omitted.)

At trial, a police officer opined "that the Peckerwoods are a
criminal street gang, as defined by the Penal Code, and that smaller
groups, such as the Small Town Peckerwoods, are all factions of
the Peckerwood organization." (*People v. Williams, supra*, 167
Cal.App.4th at p. 987.)  He testified that "Peckerwood groups
share a White pride or White supremacist ideology, and there is a
hierarchy, with 'shot callers' who answer to a higher authority
inside the prison system." (*Id.* at p. 988.)  He also testified "that
Peckerwoods are not typically organized like other criminal street
gangs, however: for the most part, they have no constitution, and
are a looser organization with a less well-defined rank structure.
Peckerwood groups get together more for bragging than for
strategizing, and one group of Peckerwoods will not necessarily
know what another group is doing." (*Ibid.*)

The court observed that the officer's opinion that the Small Town
Peckerwoods were part of some larger Peckerwood gang "appears
to have been based on commonality of name and ideology, rather
than concerted activity or organizational structure." (*People v.
Williams, supra*, 167 Cal.App.4th at p. 988.)  In concluding that
"only the Small Town Peckerwoods, and not some larger
Peckerwood group, may be considered in addressing [the
defendant's] claims of evidentiary insufficiency," (*id.* at p. 989) the
court explained that "something more than a shared ideology or
philosophy, or a name that contains the same word, must be shown
before multiple units can be treated as a whole when determining
whether a group constitutes a criminal street gang.  Instead, some
sort of collaborative activities or collective organizational structure
must be inferable from the evidence, so that the various groups
reasonably can be viewed as parts of the same overall
organization." (*Id.* at p. 988.)

Here, the evidence established the Flats and the DPHB were part
of the same overall organization.  Quinn explained that the Bloods
are the "overall umbrella" under which subsets for "major
geographical location[s]," such as the DPHB and the Oak Park
Bloods, operate.  The DPHB primarily operates in the Del Paso
Heights neighborhood in north Sacramento.  It, in turn, is
comprised of numerous subsets, such as Elm Street, the Dark Side,
Trigger Mob, and the Flats, which claim different streets or smaller
geographical areas within Del Paso Heights.  Moreover, evidence
that defendants were observed before and after the shooting in the
company of men who were validated members of the Flats and
DPHB suggested the Flats and the DPHB were engaged in
collaborative activities.  In sum, the jury's findings that defendants
committed the offenses for the benefit of or in association with the
DPHB is supported by substantial evidence.

17

1   ECF No. 12-1 at 25-29.

2   **2.      Law Applicable to Claims of Insufficient Evidence**

3         The Due Process Clause "protects the accused against conviction except upon proof

4   beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

5   charged." *In re Winship*, 397 U.S. 358, 364 (1970).  There is sufficient evidence to support a

6   conviction if, "after viewing the evidence in the light most favorable to the prosecution, any

7   rational trier of fact could have found the essential elements of the crime beyond a reasonable

8   doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  "[T]he dispositive question under

9   *Jackson* is 'whether the record evidence could reasonably support a finding of guilt beyond a

10  reasonable doubt.'"  *Chein v. Shumsky*, 373 F.3d 978, 982 (9th Cir. 2004) (quoting *Jackson*, 443

11  U.S. at 318).  Put another way, "a reviewing court may set aside the jury's verdict on the ground

12  of insufficient evidence only if no rational trier of fact could have agreed with the jury."

13  *Cavazos v. Smith*, ___ U.S. ___, 132 S.Ct. 2, *4 (2011).

14        In conducting federal habeas review of a claim of insufficient evidence, "all evidence

15  must be considered in the light most favorable to the prosecution."  *Ngo v. Giurbino*, 651 F.3d

16  1112, 1115 (9th Cir. 2011).  "*Jackson* leaves juries broad discretion in deciding what inferences

17  to draw from the evidence presented at trial," and it requires only that they draw "'reasonable

18  inferences from basic facts to ultimate facts.'"  *Coleman v. Johnson*,___ U.S. ___, 132 S.Ct.

19  2060, 2064 (2012) ( per curiam ) (citation omitted).  "'Circumstantial evidence and inferences

20  drawn from it may be sufficient to sustain a conviction.'"  *Walters v. Maass*, 45 F.3d 1355, 1358

21  (9th Cir.1995) (citation omitted).

22         "A petitioner for a federal writ of habeas corpus faces a heavy burden when challenging

23  the sufficiency of the evidence used to obtain a state conviction on federal due process grounds."

24  *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005).  In order to grant relief, the federal habeas

25  court must find that the decision of the state court rejecting an insufficiency of the evidence

26  claim reflected an objectively unreasonable application of *Jackson* and *Winship* to the facts of

1    the case.  *Ngo*, 651 F.3d at 1115; *Juan H.*, 408 F.3d at 1275 & n.13.  Thus, when a federal

2    habeas court assesses a sufficiency of the evidence challenge to a state court conviction under

3    AEDPA, "there is a double dose of deference that can rarely be surmounted."  *Boyer v. Belleque*,

4    659 F.3d 957, 964 (9th Cir. 2011).  The federal habeas court determines sufficiency of the

5    evidence in reference to the substantive elements of the criminal offense as defined by state law.

6    *Jackson*, 443 U.S. at 324 n.16; *Chein*, 373 F.3d at 983.

7                    **3.    Analysis**

8              After reviewing the state court record in the light most favorable to the jury's verdict, this

9    court concludes that there was sufficient evidence introduced at petitioner's trial to support his

10   convictions for assault with a firearm and shooting at an occupied vehicle.  There was also

11   sufficient evidence to support the jury's finding that petitioner and Jones committed the crimes

12   alleged in Counts 1 and 2 for the benefit of or in association with a criminal street gang.  For the

13   reasons expressed by the California Court of Appeal, there was evidence from which the jury

14   could have found that: (1) Jones did not act in self-defense when he fired his gun but was

15   "responding to a challenge by a rival gang in an attempt to retain his respect," and then escalated

16   the situation in order to provoke a gunfight; (2) petitioner aided and abetted Jones in these

17   actions by giving Jones a gun after a rival gang had issued a challenge; and (3) petitioner and

18   Jones were acting in furtherance of their street gang when they engaged in the gunfight at the

19   scene of the crime.  This is true regardless of the fact that there might have been other trial

20   evidence which supported petitioner's version of the events.  The question in this federal habeas

21   action is not whether there was evidence from which the jury could have found for the petitioner

22   on these issues.  Rather, in order to obtain federal habeas relief on this claim, petitioner must

23   demonstrate that the state courts' denial of relief with respect to his insufficiency of the evidence

24   arguments was an objectively unreasonable application of the decisions in *Jackson* and *Winship*

25   to the facts of this case.  Petitioner has failed to make this showing, or to overcome the

26   /////

deference due to the state court's findings of fact and its analysis of this claim.  Accordingly, he

is not entitled to federal habeas relief on his claims of insufficient evidence.

### B.  Prosecutorial Misconduct

The California Court of Appeal also rejected petitioner's argument that the evidence was

insufficient to support his convictions because one of the prosecutor's theories in opposition to

petitioner's claim of self-defense – that any actual belief by defendants that they were in

imminent danger was unreasonable – was factually and legally inadequate.  However, because

that claim was based on comments made the prosecutor during closing argument, the Court of

Appeal construed it as a claim of prosecutorial misconduct.  This court also construes

petitioner's argument as a claim of prosecutorial misconduct, and will address it accordingly.

### 1.    State Court Opinion

The California Court of Appeal denied petitioner's claim of prosecutorial misconduct,

reasoning as follows:

> **The Prosecutor Did Not Commit Misconduct During Closing Argument**
>
> Defendants contend the prosecutor's purported theory that any belief by defendants that they were in imminent danger was unreasonable was legally inadequate, and thus, their convictions for counts 1 and 2 must be reversed.  Because this contention is premised on comments made by the prosecutor during closing argument, it is properly analyzed as a claim of prosecutorial misconduct.  As we shall explain, Deloney forfeited the claim by failing to raise it below, and in any case, when considered in context, the prosecutor's comments were proper.
>
> As a preliminary matter, we observe that Deloney did not object to the challenged comments below.[15]  There is no indication that a meritorious objection would have been futile, and an admonition could have cured any potential harm resulting from the perceived misconduct.  Accordingly, he forfeited the issue on appeal. (*People v. Farnam* (2002) 28 Cal.4th 107, 199–200.)  In any event, no instance of prejudicial misconduct appears.

---

[15]  Jones objected to the prosecutor's comments as improper "public policy argument," and the trial court overruled the objection.

In order to obtain reversal under the federal Constitution, any prosecutorial misconduct must be so egregious that it results in unfairness and constitutes a denial of due process. (*People v. Prieto* (2003) 30 Cal.4th 226, 260.) Prosecutorial conduct that does not render a trial fundamentally unfair is misconduct under state law only when it attempts to persuade the trier of fact with reprehensible or deceptive methods. (*Ibid.*)

Defendants claim the prosecutor improperly argued that any actual belief by defendants that they were in imminent danger was unreasonable "since they were gang members taking part in an escalating gang conflict," "gang members do not 'get' a right of self defense when they are in an escalating gang conflict," and "the jury itself decides what the law is and the jury should decide that in gang fights, gang members have no right to self-defense . . . ."

In support of their assertions, defendants point to two portions of the prosecutor's closing argument in Deloney's case: First, the prosecutor argued: "If you find that the beliefs were honest; you have to decide were they reasonable, okay?  You have to decide whether somebody who is involved in an escalating gang conflict gets a reasonable right of self defense.  You have to decide that Mr. Deloney is on the phone, and a bunch of his home boys show up, whether that points to a reasonable self defense.  You have to decide whether the fact that he gets a gun and immediately gives it up to his buddy leads to a reasonable conclusion of self-defense."

Later, at the conclusion of his argument, the prosecutor stated, "At the end of the day ladies and gentlemen, you decide reasonableness.  You are representatives of our community, and you decide in this situation whether this is the kind of situation you want self defense to be available on in our community.  And if, at the end of the day, you find a situation where two gangs square off, fight, yell their gang stuff, mutually arm themselves, that that leads to self defense for the person who shoots second, then that's your right.  That's why we have the jury system.  [¶]  And if that's what you decide, it is not proven who shot first, since the tie goes to the defendant, you should assume that Mr. Jones shot second, okay?  You should make that assumption because I certainly haven't proven beyond a reasonable doubt that he shot first.  And if you decide in this situation that you want self-defense to apply, then that's your right and they are not guilty.  Mr. Deloney is not guilty.  [¶]  But if you find that, in our community, gangs cannot act like this, that they don't get to square off, yell their gang slogans, fight each other, arm themselves, talk trash back and forth, and then have a shootout, and it comes down to a matter of timing of who shot first and who shot second, then they're absolutely guilty.  You get to apply the law.  You get to decide how this situation is evaluated in Sacramento County."  The prosecutor made similar statements during his closing argument in Jones's case.

When the prosecutor's comments are considered in context, it is clear that he was responding to defendants' anticipated argument that Jones necessarily was acting in self-defense because he fired only after he was fired upon.  Indeed, both defendants argued just that.[16]  The prosecutor argued such a result would not be reasonable under the circumstances of this case, which he claimed involved an "escalating gang conflict" during which "two gangs are squaring off, fighting, yelling gang stuff, [and] arming themselves . . . ."  As the prosecutor argued elsewhere in his closing, if defendants intentionally provoked the gunfight or were engaged in mutual combat, they did not have a right to self-defense even if Jones did not shoot until after he was fired upon.  The prosecutor's comments were fair commentary on reasonable inferences to be drawn from the evidence.  (*People v. Farnam, supra,* 28 Cal .4th at p. 200; *People v. Williams* (1997) 16 Cal.4th 153, 221.)

Nor do we construe the prosecutor's argument as urging the jury to disregard the law, as defendants suggest.  In any case, the prosecutor clarified the issue during his rebuttal.  In response to Deloney's argument that the jury should not "accept the [prosecutor's] invitation to essentially disregard the law" and find that Jones did not have a right to self-defense simply because he is a gang member and armed himself, the prosecutor stated, "I never said ignore the law of self-defense . . . .  [¶]  I hope none of you got that from my argument.  Okay? . . .  [¶] . . .  [¶]  What I was saying in my argument about you apply the law and you decide how things go in Sacramento County is simply that self-defense is based and it's predicated entirely upon a jury deciding that the defendant actually believed in the danger, and was it reasonable.  And the reasonable standard.  There's no definition in there.  You decide what your definition of reasonable is.  And what I was saying is: Follow the law, but you decide what's reasonable.  And if you find that two gangsters squaring off and shooting at each other, nobody had the right of self-defense, that sounds reasonable to me."[17]

---

[16]  Among other things, Deloney argued: "[T]he right of Jimmy Jones to self-defense attached after the person from Oak Park shot first.  I am not saying that he had a right of self-defense before then, but I think when I get going through the evidence the only reasonable conclusion is that somebody from Oak Park shot first and that Jimmy Jones shot in response."  Jones, likewise, argued, "Not until the time that they're shooting does Mr. Jones shoot.  That's self-defense, ladies and gentlemen."

[17]  Jones, through his counsel, also argued that everybody, including gang members, have a right to self-defense.  Jones further argued that the prosecutor "wants you to look past the issues of self-defense and say, kind of on a public policy argument there, that because there's a gang situation, there is no right to self-defense.  There is nothing in the law that says that a person who is involved in a gang conflict does not have a right to self defense."  Later, during

1   The jury was instructed on the law of self-defense.  Of particular
2   relevance here, the jury was instructed that "[t]he defendant must
    have believed there was imminent danger of violence to himself or
    someone else.  Defendant's belief must have been reasonable and
3   he must have acted only because of that belief.  [¶] . . . [¶]  In
    deciding whether the defendant's beliefs were reasonable, consider
4   all the circumstances as they were known to and appeared to the
    defendant and consider what a reasonable person in a similar
5   situation with similar knowledge would have believed."[18]  The jury
    was also instructed that it was to follow the law as instructed and
6   to disregard the attorneys' arguments to the extent they conflicted
    with the instructions given.  We presume the jury followed the
7   court's instructions. (*People v.. Yeoman* (2003) 31 Cal.4th 93,
    139.) On this record, we conclude "'there is [not] a reasonable
8   likelihood that the jury construed or applied any of the
    complained-of remarks in an objectionable fashion.'"  (*People v.*
9   *Prieto, supra*, 30 Cal.4th at p. 260.)

10  ECF No. 12-1 at 43-49.

11  ## 2.   Procedural Bar

12      As set forth above, the California Court of Appeal concluded that petitioner forfeited his

13  claim of prosecutorial misconduct by failing to make a contemporaneous objection to the

14  prosecutor's statements during his closing argument.  Respondent argues that the state court's

15  finding of waiver constitutes a state procedural bar precluding this court from addressing the

16  merits of this claim.  ECF 12 at 26-27.

17  ───────────────────

18  rebuttal, the prosecutor stated, "This isn't a defense situation.  This is gangsters arming
    themselves and having a shootout.  And you do get to apply your reasonableness standard as to
19  whether this is self-defense and whether you want to apply it in this case based on these facts.

20      [18]  The jury was instructed in the language of CALCRIM No. 3470 in pertinent part as
    follows: "Self-defense is a defense to the crimes charged in counts 1 and 2.  The defendant is not
21  guilty of that crime if he used force against the other person in lawful self-defense or defense of
    another.  [¶]  The defendant acted in lawful self-defense or defense of another if, one, the
22  defendant reasonable [sic] believed that he or someone else was in imminent danger of suffering
    bodily injury; two, the defendant reasonably believed that the immediate use of force was
23  necessary to defend against that danger; and three, the defendant used no more force than was
    reasonably necessary to defend against that danger.  [¶] . . .  The defendant must have believed
24  there was imminent danger of violence to himself or someone else.  Defendant's belief must have
    been reasonable and he must have acted only because of that belief.  [¶] . . . [¶]  In deciding
25  whether the defendant's beliefs were reasonable, consider all the circumstances as they were
    known to and appeared to the defendant and consider what a reasonable person in a similar
26  situation with similar knowledge would have believed."

Petitioner does not deny that his trial counsel did not raise a contemporaneous objection to the prosecutor's closing remarks.  His prosecutorial misconduct claim therefore appears to be procedurally barred.  *See Coleman v. Thompson*, 501 U.S. 722, 747 (1991); *Paulino v. Castro*, 371 F.3d 1083, 1092-93 (9th Cir. 2004) (petitioner's claim before federal court procedurally barred where state court denied the claim on the grounds of a lack of contemporaneous objection by trial counsel); *Rich v. Calderon*, 187 F.3d 1064, 1070 (9th Cir. 1999) ("We may not review his six other prosecutorial misconduct claims because [petitioner] procedurally defaulted by failing to make contemporaneous objections, and the California court consequently invoked a procedural bar to their consideration, the validity of which Rich has failed to overcome"). However, even if petitioner's claim of prosecutorial misconduct is not procedurally barred, it should be denied for the following reasons.

### 3.    Law Applicable to Claims of Prosecutorial Misconduct

A criminal defendant's due process rights are violated when a prosecutor's misconduct renders a trial fundamentally unfair.  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  Claims of prosecutorial misconduct are reviewed "'on the merits, examining the entire proceedings to determine whether the prosecutor's [actions] so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir. 1995) (citation omitted).  *See also Greer v. Miller*, 483 U.S. 756, 765 (1987); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *Towery v. Schriro*, 641 F.3d 300, 306 (9th Cir. 2010). Relief on such claims is limited to cases in which the petitioner can establish that prosecutorial misconduct resulted in actual prejudice.  *Darden*, 477 U.S. at 181-83.  *See also Towery*, 641 F.3d at 307 ("When a state court has found a constitutional error to be harmless beyond a reasonable doubt, a federal court may not grant habeas relief unless the state court's determination is objectively unreasonable").  Prosecutorial misconduct violates due process when it has a substantial and injurious effect or influence in determining the jury's verdict.  *See Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 899 (9th Cir. 1996).

"Improper argument does not, per se, violate a defendant's constitutional rights." *Jeffries v. Blodgett*, 5 F.3d 1180, 1191 (9th Cir. 1993).  In considering claims of prosecutorial misconduct involving allegations of improper argument, the court must examine the likely effect of the statements in the context in which they were made and determine whether the comments so infected the trial with unfairness as to render the resulting conviction a denial of due process. *Darden*, 477 U.S. at 181-83; *Donnelly*, 416 U.S. at 643; *Turner v. Calderon*, 281 F.3d 851, 868 (9th Cir. 2002).  In fashioning closing arguments, prosecutors are allowed "reasonably wide latitude," *United States v. Birges*, 723 F.2d 666, 671-72 (9th Cir. 1984), and are free to argue "reasonable inferences from the evidence." *United States v. Gray*, 876 F.2d 1411, 1417 (9th Cir. 1989). *See also Ducket v. Godinez*, 67 F.3d 734, 742 (9th Cir. 1995).  "[Prosecutors] may strike 'hard blows,' based upon the testimony and its inferences, although they may not, of course, employ argument which could be fairly characterized as foul or unfair." *United States v. Gorostiza*, 468 F.2d 915, 916 (9th Cir. 1972).  "[I]t 'is not enough that the prosecutors' remarks were undesirable or even universally condemned.'" *Darden*, 477 U.S. at 181 (citation omitted). The issue is whether the "remarks, in the context of the entire trial, were sufficiently prejudicial to violate [petitioner's] due process rights." *Donnelly*, 416 U.S. at 639; *United States v. Robinson*, 485 U.S. 25, 33 (1988) ("[P]rosecutorial comment must be examined in context. . . .").

### 4.    **Analysis**

After a review of the record, the court concludes that the prosecutor in this case did not commit prejudicial misconduct in closing argument by virtue of the challenged statements.  As explained by the California Court of Appeal, a review of the closing argument as a whole reflects that the prosecutor's remarks were largely invited by the correctly anticipated argument of defense counsel, and/or were fair commentary on the evidence introduced at trial.  *See United States v. Young*, 470 U.S. 1, 12-13 (1985) ("if the prosecutor's remarks were 'invited, and did no more than respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction"); *United States v. Maloney*, 699 F.3d 1130, 1140 (9th Cir. 2012) (while

prosecutors may not base closing arguments on evidence not in the record, they are "free to argue reasonable inferences from the evidence."). The prosecutor did not misstate any evidence, and any possible misunderstanding by the jury was cleared up by the prosecutor's later explanation of his intent when making these remarks. Further, as noted by the state appellate court, the trial court correctly instructed the jurors on the law of self-defense and advised them that they should disregard the arguments of counsel to the extent they conflicted with the instructions on the law. (Clerk's Transcript on Appeal (CT) at 501, 535-37.)

Under these circumstances of this case, and considering the record as a whole, there is no possibility the prosecutor's remarks in his closing argument could have had a substantial and injurious effect or influence on the verdict. Accordingly, petitioner is not entitled to relief on his claim of prosecutorial misconduct.

## C. Evidentiary Rulings

In his third ground for relief, petitioner claims that the trial court violated his Sixth Amendment right to confront the witnesses against him, the rules regarding the admission of hearsay evidence, and California Evidence Code § 352, by "admitting heresay [sic] it should have excluded and excluded heresay [sic] it should have admitted." ECF 1 at 8. The court will address these claims in turn below.

### 1. Admission of Evidence from Unidentified Teenager

On direct appeal in state court, petitioner claimed that the trial court erred in admitting Officer Davis' testimony that he heard an unidentified teenage girl say that petitioner and Jones shot Andrelia. Resp't's Lodg. Doc. 8 at 31.

### a. State Court Decision

The California Court of Appeal granted this claim in part and denied it in part, reasoning as follows:

> Defendants next contend the trial court prejudicially erred in allowing Officer Steven Davis to testify that he overheard an unidentified teenage girl state that defendants shot Andrelia.

Defendants argue the admission of the statement violated their Sixth Amendment rights to confront and cross-examine witnesses against them.  They also assert that the trial court abused its discretion in determining the statement was admissible under the spontaneous statement exception to the hearsay rule.  (Evid.Code, § 1240).

The People respond that defendants forfeited their Sixth Amendment claim by failing to raise it below, and in any case, the Sixth Amendment is not implicated because the statement was not testimonial.  (*Crawford v. Washington* (2004) 541 U.S. 36, 68 [158 L.Ed.2d 177, 203] (*Crawford*)).  They also assert that the statement qualified as a "spontaneous statement" under Evidence Code section 1240, and thus, its admission did not violate defendants' right to confrontation under the Sixth Amendment and fell within an exception to the hearsay rule.  They further argue any error in admitting the statement was harmless.

As we shall explain, even assuming the Sixth Amendment claim was not forfeited, the statement was not testimonial, and thus, did not run afoul of the Sixth Amendment.  We do find, however, that the statement did not fall within the spontaneous statement exception; and thus, the trial court abused its discretion in admitting it.  While we agree with the People that the error was harmless as to the underlying offenses, the same cannot be said for the personal infliction of great bodily injury enhancement appended to Jones's sentence on count 1.  Accordingly, we shall reverse the jury's finding that Jones personally inflicted great bodily injury on Andrelia in the commission of counts 1 and 2 and strike the enhancement.

Officer Davis was the first emergency responder to arrive on the scene.  When he arrived, he found Andrelia lying on her back and several people standing near her, including a teenage girl.  While he was talking to Andrelia, he overheard the teenage girl talking to someone.  Jones objected to Davis testifying as to what he heard the girl say on hearsay grounds.  The trial court overruled the objection, concluding the statement was admissible under the spontaneous statement exception to the hearsay rule.  (Evid.Code, § 1240.)  Thereafter, Davis testified that the girl said defendants shot Andrelia.  Davis asked another officer to obtain a statement from the girl, but he did not know if that was ever done.

A defendant's Sixth Amendment right of confrontation is violated by the admission of testimonial statements of a witness who was not subject to cross-examination at trial, unless the witness was unavailable to testify, and the defendant had a prior opportunity for cross-examination.  (*Crawford, supra*, 541 U.S. at p. 68 [158 L.Ed.2d at p. 203].)  "Testimony" means "'[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'"  The "core class" of testimonial statements includes

affidavits, custodial examinations, prior testimony not subject to cross-examination, and "'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" (*Id.* at pp. 51–52 [158 L.Ed.2d at pp. 192–193].)

Here, Davis overheard the girl tell another bystander defendants shot Andrelia.[19]  Her statement was not a solemn declaration or affirmation.  Nor was it made under circumstances which would lead an objective witness to reasonably believe the statement would be available for later use at a trial.  (*Crawford, supra*, 541 U.S. at pp. 51–52 [158 L.Ed.2d at pp. 192–193].)  As our Supreme Court acknowledged in *Crawford*, "An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."  (*Id.* at p. 51 [158 L.Ed.2d at p. 192].)  Accordingly, the statement was not testimonial, and there is no Sixth Amendment issue, even assuming the issue was preserved for review.  (*Id.* at p. 68 [158 L.Ed.2d at p. 203].)

Defendants also contend the trial court abused its discretion in admitting the statement under Evidence Code section 1240 "because there was no evidence that the teenager was a percipient witness to the shooting."

Evidence Code section 1240 provides that "[e]vidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event *perceived by the declarant*; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception." (Italics added.)  "It must . . . appear 'in some way, at least, and with some degree of persuasive force' that the declarant was a witness to the event to which [her] utterance relates.  [Citation.]  Although this does not require direct proof that the declarant actually witnessed the event and a persuasive inference that [s]he did is sufficient, the fact that the declarant was a percipient witness should not be purely a matter of speculation or conjecture."  (*Ungefug v. D'Ambrosia* (1967) 250 Cal.App.2d 61, 68 (*Ungefug*).)  *Ungefug* involved a wrongful death action brought by the surviving daughter and husband of a woman fatally injured when she was struck by an automobile.  (250 Cal.App.2d at p. 63.)  At trial, an ambulance driver was permitted to testify that he "heard someone make the statement

---

[19]  Defendants' suggestion that the statement was made in response to questioning by Davis is not supported in the record.  After Davis testified that he "heard [the girl] talking to someone," the prosecutor asked, "What did she tell you?"  Davis responded, "She told me who shot her, the girl on the ground."  The prosecutor then asked, "Who did she tell you?"  Davis responded, "Jimmy Jones and DeAndre Deloney."  During cross-examination, however, Davis clarified that he overheard a conversation between two individuals.

that [the victim] had been hit twice, by another car that did not stop . . . ." (*Id.* at pp. 65–66.)  In concluding the trial court erred in admitting the testimony of the ambulance driver, the court found the "defendant failed to show except by the remotest inference, conjecture or speculation that the one who made the statement saw the accident.  There is no evidence that there were eyewitnesses to the accident or that there were others in the immediate vicinity of the scene or its occurrence.  Not only was the declarant unidentified, there was no evidence that the ambulance driver even saw him or her.  Declarant may have been merely repeating what others, including defendant, might have said." (*Id.* at p. 68.)

Here, as in *Ungefug*, the declarant was unidentified.  Her statement to the other bystander did not indicate she had personally observed the shooting.  While there were eyewitnesses to the shooting, there is no evidence that the teenage girl was among them.  To the contrary, the evidence reflects that the only girls present were Andrelia, Raukiya, and the two females that arrived with Keeburee's brothers, and the two females that arrived with Keeburee's brothers left immediately after the shooting.  On this record, it would be pure speculation to conclude the teenage girl saw defendants shoot Andrelia, as opposed to repeating what someone else might have told her.  (*Ungefug*, 250 Cal.App.2d at p. 68; *see also People v. Phillips* (2000) 22 Cal.4th 226, 235–237.)  Thus, the trial court abused its discretion in admitting the girl's statement.

Defendants contend they were prejudiced by the error because "absent the teenager's statement, the jury may have decided that Jones acted in lawful self-defense."  More particularly, they contend that "[b]y saying that [defendants] shot the girl . . ., the teen indicated to the officer that she believed [defendants] were responsible for the shooting; she did not believe they acted in lawful self-defense."  The People respond that any error was harmless.  They note that it was undisputed that Jones fired the gun and assert that "the matter of whose bullet actually struck Andrelia . . . was not a material issue in the trial, since the theory underlying [defendants'] criminal culpability was proximate cause."

We fail to see how the teenager's statement indicated that she did not believe defendants acted in "lawful self-defense."  As defendants readily acknowledge, it is possible to shoot someone in self-defense.  The two are not mutually exclusive.  Moreover, the prosecutor did not argue or otherwise suggest that the teenager's statement indicated that she believed Jones did not act in self-defense.  Indeed, he did not mention the teenager's statement during his closing argument in either case.  On this record, it is not reasonably probable that a result more favorable to defendants would have been reached on the underlying offenses in the absence of the error.  (*People v. Watson* (1956) 46 Cal.2d 818, 836.)  The same, however, cannot be said for the personal infliction of great

bodily injury enhancement.

The jury found true an allegation Jones personally inflicted great bodily injury on Andrelia in the commission of counts 1 and 2 within the meaning of section 12022.7, subdivision (a), and imposed a three-year enhancement on his sentence on count 1.

Section 12022.7, subdivision (a) provides in pertinent part: "Any person who personally inflicts great bodily injury on any person other than an accomplice in the commission of a felony . . . shall be punished by an additional and consecutive term of imprisonment in the state prison for three years." (Italics added.) "To 'personally inflict' an injury is to directly cause an injury, not just to proximately cause it." (*People v. Rodriguez* (1999) 69 Cal.App.4th 341, 347–348, cited with approval in *People v. Bland* (2002) 28 Cal.4th 313, 337.) Thus, in finding that Jones personally inflicted great bodily injury on Andrelia, the jury necessarily concluded Jones shot her.  Neither Andrelia nor Famous was able to say who actually shot Andrelia, and the forensic evidence was far from conclusive.  Thus, it is reasonably probable that the jury would not have found true the allegation Jones personally inflicted great bodily injury on Andrelia had the teenager's statement not been admitted.  Accordingly, we shall strike the enhancement.

ECF 12-1 at 29-36.

### b.     <u>Applicable Law</u>

The Sixth Amendment to the United States Constitution grants a criminal defendant the right "to be confronted with the witnesses against him."  U.S. CONST. amend. VI.  "The 'main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination.'"  *Fenenbock v. Director of Corrections for California*, 692 F.3d 910, 919 (9th Cir. 2012) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986)).  The Confrontation Clause applies to the states through the Fourteenth Amendment.  *Pointer v. Texas*, 380 U.S. 400, 406 (1965).

In 2004, the United States Supreme Court held that the Confrontation Clause bars the state from introducing into evidence out-of-court statements which are "testimonial" in nature unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness, regardless of whether such statements are deemed reliable.  *Crawford v. Washington*,

/////

541 U.S. 36 (2004).[20]  The *Crawford* rule applies only to hearsay statements that are

"testimonial" and does not bar the admission of non-testimonial hearsay statements.  *Id.* at 42,

51, 68.  *See also Whorton v. Bockting*, 549 U.S. 406, 420 (2007) ("the Confrontation Clause has

no application to" an "out-of-court nontestimonial statement.").

　　　　Although the *Crawford* court declined to provide a comprehensive definition of the term

"testimonial," it stated that "[s]tatements taken by police officers in the course of interrogations

are . . . testimonial under even a narrow standard."  *Crawford*, 541 U.S. at 52.  The court also

provided the following "formulations" of a "core class" of testimonial statements: (1) "ex parte

in-court testimony or its functional equivalent – that is, material such as affidavits, custodial

examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial

statements that declarants would reasonably expect to be used prosecutorially;" (2) "extrajudicial

statements . . . contained in formalized testimonial materials, such as affidavits, depositions,

prior testimony, or confessions;" and (3) "statements that were made under circumstances which

would lead an objective witness reasonably to believe that the statement would be available for

use at a later trial."  *Id.* at 51-52.  The court in *Crawford* also pointed out that the Sixth

Amendment Confrontation Clause "does not bar the use of testimonial statements for purposes

other than establishing the truth of the matter asserted."  *Id.* at 59, n.9.  However, "state evidence

rules do not trump a defendant's constitutional right to confrontation," and a reviewing court

"ensures that an out-of-court statement was introduced for a 'legitimate, nonhearsay purpose'

before relying on the not-for-its-truth rationale to dismiss the Confrontation Clause's

application." (citation omitted).  *Williams v. Illinois*, ___ U.S. ___, 132 S.Ct. 2221, 2226 (2012).

　　　　Confrontation Clause violations are subject to harmless error analysis.  *Whelchel v.*

*Washington*, 232 F.3d 1197, 1205-06 (9th Cir. 2000).  "In the context of habeas petitions, the

standard of review is whether a given error 'had substantial and injurious effect or influence in

---

[20]　　The *Crawford* decision applies to this case because it was decided prior to
petitioner's appeal.  *Winzer v. Hall*, 494 F.3d 1192, 1194 (9th Cir. 2007).

1   determining the jury's verdict.'" *Christian v. Rhode*, 41 F.3d 461, 468 (9th Cir. 1994) (quoting

2   *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).  Factors to be considered when assessing the

3   harmlessness of a Confrontation Clause violation include the importance of the testimony,

4   whether the testimony was cumulative, the presence or absence of evidence corroborating or

5   contradicting the testimony, the extent of cross-examination permitted, and the overall strength

6   of the prosecution's case.  *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986);[21] *United States v.*

7   *Norwood*, 603 F.3d 1063, 1068-69 (9th Cir.), *cert. denied*, ___U.S.___, 131 S. Ct. 225 (2010).

8                                   c.    **Analysis**

9         This court agrees with the California Court of Appeal that the unidentified teenager's

10  statement to another person, which was overheard by Officer Davis, was not "testimonial" and

11  therefore is not prohibited by the Confrontation Clause.  Her statement was not made under

12  circumstances which would lead an objective witness to believe it would be available for later

13  use at a trial.  Nor was the statement made to a government officer, as was the case in *Crawford*.

14  Although petitioner argued in state court that the statement was "testimonial" because it was

15  given to a police officer, the testimony at trial clarified that the statement was simply overheard

16  by Officer Davis and was not made directly to him.  Finally, the statement does not fall within

17  the "per se" examples of testimonial evidence offered by the *Crawford* court, all of which

18  involve out-of-court statements elicited by a government officer with a view to prosecution.

19  Rather, the teenager made her statement to another person, with no expectation that her remark

20  would be used by a prosecutor at a later trial.  Under these circumstances, the unidentified

21  teenager's statements were not testimonial, as that term was defined in *Crawford*, and are not

22  inadmissible under the Sixth Amendment Confrontation Clause.  *See Jensen v. Pliler*, 439 F.3d

23  1086 (9th Cir. 2006) (statements made by declarant to his attorney were non-testimonial and

24

25         [21]  Although *Van Arsdall* involved a direct appeal and not a habeas action, "there is
    nothing in the opinion or logic of *Van Arsdall* that limits the use of these factors to direct
26  review."  *Whelchel*, 232 F.3d at 1206.

1    therefore not barred by the Confrontation Clause); *Doan v. Carter*, 548 F.3d 449, 458 (6th Cir.

2    2008) (victim's statements to friends and neighbors not testimonial); *United States v. Manfre*,

3    368 F.3d 832, 838 n.1 (8th Cir. 2004) (statements made by declarant to family members were not

4    "testimonial" because they were "not the kind of memorialized, judicial-process-created

5    evidence of which *Crawford* speaks"); *Gonzales v. Clark*, No. CV 08-02251-AG (VBK), 2009

6    WL 3233906, *8 (C.D. Cal. Sept. 30, 2009) (petitioner's private statements to his aunt not

7    testimonial in nature).

8        Petitioner also argues that the admission into evidence of Officer Davis' testimony about

9    the teenager's remarks violated his right to due process.  A writ of habeas corpus will be granted

10    for an erroneous admission of evidence "only where the 'testimony is almost entirely unreliable

11    and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and

12    take due account of its shortcomings.'" *Mancuso v. Olivarez*, 292 F.3d 939, 956 (9th Cir. 2002)

13    (quoting *Barefoot v. Estelle*, 463 U.S. 880, 899 (1983)).  Admission of evidence violates due

14    process only if "there are no permissible inferences the jury may draw from the evidence."

15    *Jammal v. Van de Kamp* , 926 F.2d 918, 920 (9th Cir. 1991).  "Even then, the evidence must 'be

16    of such quality as necessarily prevents a fair trial.'"  *Id.* (quoting *Kealohapauole v. Shimoda*, 800

17    F.2d 1463 (9th Cir. 1986)).

18        Moreover, as the Ninth Circuit has observed:

19        The Supreme Court has made very few rulings regarding the
         admission of evidence as a violation of due process.  Although the
20       Court has been clear that a writ should be issued when
         constitutional errors have rendered the trial fundamentally unfair
21       (citation omitted), it has not yet made a clear ruling that admission
         of irrelevant or overtly prejudicial evidence constitutes a due
22       process violation sufficient to warrant issuance of the writ.

23    *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009).  Therefore, "under AEDPA, even

24    clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit

25    the grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as

26    laid out by the Supreme Court." *Id.*  Applying these legal principles here, the state court's

33

1    rejection of petitioner's due process claim in this case does not support petitioner's request for

2    federal habeas relief under AEDPA because the admission of evidence regarding Officer Davis'

3    testimony did not violate any clearly established federal law.  *Id.*

4          In any event, the admission of the challenged evidence did not deny petitioner a fair trial.

5    Officer Davis' testimony about the unidentified teenager was not particularly damaging, given

6    petitioner and Jones' concession that Jones fired a gun that was given to him by petitioner.

7    Further, the teenager's statement had no bearing on petitioner's defense that Jones shot in self-

8    defense or in defense of others, and was not necessarily based on her personal observation of the

9    events.  In sum, the statement was a passing remark and, as such, would have had no significant

10   impact on the verdict in this case.

11         Finally, petitioner argues that the trial court violated rules regarding the admissibility of

12   hearsay statements and the California Evidence Code in admitting the testimony of Officer Davis

13   about the statements he overheard.  However, the decision of the California Court of Appeal on

14   these state law claims is binding on this court and may not be challenged in this federal habeas

15   proceeding.  This Court is bound by the state court's interpretation of state law.  *Waddington v.*

16   *Sarausad*, 555 U.S. 179, 129 S.Ct. 823, 832 n.5 (2009) ("we have repeatedly held that 'it is not

17   the province of a federal habeas court to reexamine state-court determinations on state-law

18   questions"); *Rivera v. Illinois*, 556 U.S. 148, 158 (2009) ("[A] mere error of state law . . . is not a

19   denial of due process") (quoting *Engle v. Isaac*, 456 U.S. 107, 121, n. 21 (1982) and *Estelle v.*

20   *McGuire*, 502 U.S. 62, 67, 72-73 (1991)); *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("a state

21   court's interpretation of state law . . . binds a federal court sitting in federal habeas"); *Lewis v.*

22   *Jeffers*, 497 U.S. 764, 780 (1990) (federal habeas corpus relief does not lie for errors of state

23   law).

24         For all of these reasons, petitioner is not entitled to relief on his challenge to the

25   admission into evidence of Officer Davis' remarks about the unidentified teenager.

26   /////

2.  **Exclusion of Evidence regarding Muhammad and Anthony Ivy**

On direct appeal, petitioner claimed that the trial court erred in excluding exculpatory

evidence that Muhammad and Anthony Ivy claimed responsibility for the shooting.  Resp't's

Lodg. Doc. 8 at 30-44.  The California Court of Appeal denied this claim, reasoning as follows:

> Defendants also contend the trial court erred in excluding evidence
> that Anthony and Muhammad told Raukiya that they, and not
> defendants, were responsible for shooting Andrelia.  We disagree.
>
> At trial, defendants sought to introduce evidence that after the
> shooting (1) Muhammad told Raukiya, "I shot Andrelia . . . with
> my gun[,]" (2) Anthony told Raukiya, "I feel sorry for the niggas
> that are in jail for something that we did[,]" and (3) Anthony or
> Muhammad told Raukiya, "I'll shoot you like I shot that bitch."
> Defendants argued the statements were admissible as declarations
> against interest because, among other things, the statements
> "clearly put the declarant[s] at risk of criminal liability in that they
> are admissions to committing the offense for which the defendants
> are charged."  (Evid.Code, § 1230.)  Defendants further argued
> that the evidence was relevant to a "third party culpability defense
> . . . ."  According to defendants, who shot Andrelia was relevant to
> "allegations Jimmy Jones personally inflicted great bodily injury
> and that Jimmy Jones fired unprovoked shots, one of which must
> have hit the victim."  Defendants also asserted that the evidence
> was relevant insofar as Anthony and Muhammad admitted firing
> shots during the incident.
>
> The People objected to the admission of the statements, arguing,
> among other things, that the statements were not trustworthy
> within the meaning of Evidence Code section 1230.  The People
> claimed that, when considered in context, the statements plainly
> were "not made to inculpate [the declarant] or even exculpate the
> defendants; [they were made] only to instill fear in [Raukiya]."
> The People also argued the statements were unreliable because
> some of them were demonstrably false.
>
> In ruling the statements were inadmissible, the trial court found
> "[t]hey're inherently unreliable given the totality of the
> circumstances and the context within which they were made."  The
> court also noted that "one of the statements by Muhammad is 'I
> shot Andrelia with my own gun.  I went to jail for that.'  And that
> statement was not true, the jail part.  It was used to bolster the
> intimidation or to create further fear by stating something that was
> flat out not true."
>
> The motion to admit the statements stemmed from a statement
> Raukiya gave to Sacramento Police Officer J. Scoubes in May
> 2007, which Scoubes summarized in a report the following day.

35

According to the report, Raukiya telephoned Keeburee in response to a message Keeburee left on Raukiya's "My Space" page. During the conversation, Keeburee accused Raukiya of "snitching" on her and her three brothers in connection with the shooting and threatened to shoot up Raukiya's house and sister. "Anthony Ivy, Muhammed [sic] Ivy, and Malcom [sic] were with Keeburee at the time of the phone conversation. Anthony said, 'We want your head.' Muhammed [sic] and Malcom [sic] said, 'We are going to shoot up your house and your grandma's house, you gonna get it.' Muhammed [sic] said, 'I went to jail over the shooting. I shot Andrelia . . . with my gun, it's a rap for you.' He went on and said, 'If you try to get someone, you know where I stay. I want your head.' Anthony said, 'You are going to get it so watch your back, and I want to come over. I feel sorry for the Niggas that are in jail for something that we did. Your [sic] next.' Malcom [sic] and Muhammed [sic] said, 'I am going to shoot you like I did your friend (referring to Andrelia . . .). You will be rolling in a wheelchair like Andrelia.' "

At a subsequent evidentiary hearing in September 2008, Raukiya testified that she did not recall speaking with Officer Scoubes. She recalled receiving a telephone call from Keeburee, Malcolm, and two other men, whose voices she did not recognize. During the call, someone stated, "I'll shoot you like I shot that bitch," but she could not tell who it was. She also testified that Malcolm, not Anthony, said, "I'm happy them niggas in jail for something that . . . we did." She denied telling law enforcement that Muhammad said, "I shot Andrelia . . . with my gun."

Malcolm, Muhammad, and Anthony each invoked his Fifth Amendment privilege and refused to testify about the shooting or any subsequent conversation with Raukiya.

An out-of-court statement made by an unavailable witness is admissible if the statement, when made, was against the declarant's penal interest, such "that a reasonable man in his position would not have made the statement unless he believed it to be true." (Evid.Code, § 1230.) The proponent of the evidence "must show that the declarant is unavailable, that the declaration was against the declarant's penal interest, and that the declaration was sufficiently reliable to warrant admission despite its hearsay character." (*People v. Cudjo* (1993) 6 Cal.4th 585, 607.) "To determine whether the declaration passes the required threshold of trustworthiness, a trial court 'may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.' [Citation.] On appeal, the trial court's determination on this issue is reviewed for abuse of discretion." (*Ibid.*)

/////

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

> When the statements are considered in context, it is plain that the declarants' intent in claiming responsibility for shooting Andrelia was to intimidate Raukiya.  By taking responsibility for shooting Andrelia, the declarants bolstered the credibility of their threats, i.e. if they shot Andrelia, they would be more likely to carry through on their threats to shoot Raukiya, her sister, her house, and her grandmother's house.  Because the declarants had a motive to lie about shooting, their statements lacked credibility.  Stated another way, a reasonable man in the declarants' position would have taken responsibility for shooting Andrelia even if he did not shoot her in order to convince Raukiya that he would shoot her or someone close to her.  (Evid.Code, § 1230.)  Moreover, as the trial court observed, the reliability of the statements was also undermined by the fact that another statement made during the same conversation was not true.  According to Scoubes' report, Muhammad said, "I went to jail over the shooting. I shot Andrelia . . . with my gun, it's a rap for you."  However, Muhammad was never incarcerated in connection with the shooting.  As the trial court observed, "I don't know whether the jury should believe 'I shot Andrelia . . . with my own gun' . . . any more than it should believe 'I went to jail for it.' It could . . . well [be] true that neither one of those statements are . . . true . . . ."  On this record we have no trouble concluding that the trial court did not abuse its discretion in excluding them.

> Because the statements are inherently unreliable, the trial court did not violate defendants' due process rights by excluding the statements.  "'The same lack of reliability that makes . . . statements excludable under state law makes them excludable under the federal Constitution.'"  (*People v. Butler* (2009) 46 Cal.4th 847, 867, quoting *People v. Livaditis* (1992) 2 Cal.4th 759, 780.)

18  ECF No. 12-1 at 36-41.

19        The California Court of Appeal concluded that the statements made by Anthony and

20  Muhammad Ivy were not admissible under Cal. Evid. Code § 1230, largely because they were

21  unreliable and lacked credibility.  That court's analysis of state law in reaching that conclusion is

22  binding on this court.  *See Bradshaw*, 564 U.S. at 76 ("a state court's interpretation of state law,

23  including one announced on direct appeal of the challenged conviction, binds a federal court

24  sitting in habeas corpus"); *Hicks v. Feiock*, 485 U.S. 624, 630 & n.3 (1988) (a federal habeas

25  court may not disregard a California Court of Appeal's rulings on state law when the California

26  Supreme Court has denied review); *Jammal*, 926 F.2d at 919.  Because the proper application of

1   Section 1230 is purely a question of California law, this Court must defer to the state appellate

2   court's determination on this issue.

3          The remaining question it whether the state court's ruling was an unreasonable

4   application of federal constitutional law.  The Court of Appeal also concluded that the trial

5   court's evidentiary ruling did not constitute an abuse of discretion or violate the federal

6   constitution.  The United States Supreme Court has not "squarely addressed" whether a state

7   court's exercise of discretion to exclude testimony violates a criminal defendant's right to

8   present relevant evidence.  *Moses v. Payne*, 555 F.3d 742, 758-59 (9th Cir. 2009).  Nor has it

9   clearly established a "controlling legal standard" for evaluating discretionary decisions to

10  exclude the type of evidence at issue here.  *Id.* at 758.  Accordingly, the decision of the

11  California Court of Appeal that the trial court's discretionary evidentiary ruling did not violate

12  the federal constitution is not contrary to or an unreasonable application of clearly established

13  United States Supreme Court precedent and may not be set aside.  *Id.  See also Knowles v.*

14  *Mirzayance*, 556 U.S. 111, 112 (2009) ("it is not 'an unreasonable application of' 'clearly

15  established Federal law' for a state court to decline to apply a specific legal rule that has not

16  been squarely established by [the United States Supreme Court]"); *Wright v. Van Patten,* 552

17  U.S. 120, 126 (2008) (per curiam) (relief is "unauthorized" under Section 2254(d)(1) when the

18  Supreme Court's decisions "given no clear answer to the question presented, let alone one in [the

19  petitioner's] favor," because the state court cannot be said to have unreasonably applied clearly

20  established Federal law); *Brown v. Horell,* 644 F.3d 969, 983 (9th Cir. 2011) ("Between the

21  issuance of *Moses* and the present, the Supreme Court has not decided any case either 'squarely

22  address[ing]' the discretionary exclusion of evidence and the right to present a complete defense

23  or 'establish[ing] a controlling legal standard' for evaluating such exclusions."), *cert. denied*,

24  ___ U.S. ___, 2011 WL 4901379 (Nov. 14, 2011); *Summerlin v. Busby*, No. EDCV 11-0805-AG

25  (JEM), 2011 WL 7143168 (C.D. Cal. Dec. 16, 2011) (state court decision rejecting petitioner's

26  claim that the trial court violated his right to due process when it excluded impeachment

38

1   evidence pursuant to Cal. Evid. Code § 352 not contrary to or an unreasonable determination of

2   federal law).

3     Even assuming *arguendo* that the trial court's exclusion of Anthony and Muhammad

4   Ivy's statements was constitutional error, the error could not have had a "substantial and

5   injurious effect or influence in determining the jury's verdict" under the circumstances of this

6   case. *Brecht*, 507 U.S. at 623. For the reasons set forth by the California Court of Appeal, the

7   statements were unreliable given the context in which they were made, were false in at least one

8   respect, and were repudiated to some extent by Kaukiya. Given the evidence of petitioner's

9   guilt, the trial court's ruling excluding the statements by Anthony and Muhammad Ivy did not

10  result in prejudice.

11    For all of these reasons, petitioner is not entitled to federal habeas relief on this claim.

12  **IV. Conclusion**

13    Accordingly, IT IS HEREBY ORDERED that the Clerk of the Court is directed to

14  randomly assign a United States District Judge to this action.

15    For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's

16  application for a writ of habeas corpus be denied.

17    These findings and recommendations are submitted to the United States District Judge

18  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days

19  after being served with these findings and recommendations, any party may file written

20  objections with the court and serve a copy on all parties. Such a document should be captioned

21  "Objections to Magistrate Judge's Findings and Recommendations." Failure to file objections

22  within the specified time may waive the right to appeal the District Court's order. *Turner v.*

23  *Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991). In

24  his objections, if any, petitioner may address whether a certificate of appealability should issue

25  in the event he files an appeal of the judgment in this case. *See* Rule 11, Federal Rules

26  /////

Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability

when it enters a final order adverse to the applicant).

DATED:  August 6, 2013.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE

40